at L. Mr. Flemming for the appellants, Mr. Lundman for the appellees. Good morning, your honors. Roger Flemming on behalf of the plaintiff appellants of Anglers for rebuttal. Your honors, this case addresses the heart of the Magnuson-Stevens Act. It asks whether the fishery service is ultimately obligated to carry out the core requirements of the act when a council declines to do so in the first instance. If left to stand, the district court opinion could blow a crippling hole in the act because it would transform most if not all of the requirements that Congress established to meet the act's purposes, such as 16 U.S.C. 1852H into discretionary options. Doesn't it say may in H? Well, 1652H is the provision near the beginning of the act that states that the council shall add stocks of fish to fishery management. The council is not the defendant here, right? The council is not the defendant here. So we're concerned with the section that deals with what our And I could look for that citation, but I'm sure you're better at recalling it than I am. But what, didn't it say may? That's right, your honors. 1654C is the statute, is the statutory provision you're referring to. That's the provision that requires in situations like this, the secretary... No, they're not like this. Pardon me? Oh, excuse me, go ahead. Your honor, the... It's a cardinal rule of statutory construction that a statute needs to be read as a whole in view of its definitions, its findings, and its purposes. The fishery service has a discreet, legally required duty to ensure that all fishery management plans... That's correct. When read as a whole... It doesn't say shall. That's correct. It doesn't say must. That's correct, your honor. It doesn't say has to. It says may, right? You're correct. It says may. That part about us making it discretionary if we hold against you is not exactly accurate. Congress made it discretionary, didn't it? They said may. That's right. Congress very carefully crafted it to say may in this situation because the Magnuson Act includes both So in this section of the act, which is a part of the act that is a grant of authority to the agency to act when the council fails to act, it says may because it may establish its own secretarial amendment when the council fails to go forward with a discretionary provision. But it doesn't have to. It doesn't have to on a discretionary provision. But our argument is that when the statute's read as a whole, that it has to when the council fails to act on a mandatory provision. Congress created the Magnuson Act... Why would Congress say may? You said a while ago that in H, which I misstudied, the language was mandatory. Now over here in C where we're dealing with the secretary of duty, it says may. Why would Congress, reading the statute as a whole, why would Congress have a discretionary language in the section unless it was meant to be discretionary? Your Honor, because it's meant to be discretionary when the council fails to take action on a discretionary provision of the act. But it's meant to be mandatory. That's not what it says. It's a grant... As you said yourself at the beginning of your remarks, in cases like this, it seems to me this is the section that you're looking to to get the authority. That's correct, Your Honor. But you're stuck with the authority Congress granted. And what Congress granted is may authority, not shall authority. Well, when you look at the overall statutory scheme, Congress set up the Magnuson Act to take immediate action to conserve and manage fishery resources and to place them under sound management. If that may is read to establish a blanket grant of authority to the agency for any provision under the act, then it reads the purposes of Congress and all the required... Your Honor, why can't you answer my question as to why Congress used discretionary language in that section that applies to this circumstance? Unless they intended something discretionary. Again, they did intend it to be discretionary, but they also intended it to require action when a required provision is not... Did Congress ever say that? I mean, you tell us they intended that. I found nothing in your brief that pointed me to anywhere Congress had done that. I mean, you don't get to decide what the law is, Congress does. That's right. And Congress didn't say what you're just saying. You said that. Congress did. Well, it's our view that Congress did say this. Congress could have written it differently. Congress could have written a much longer statute that... No, they couldn't have been much longer than this. But in this situation, if you look at the structure of the act, the section that we're talking about right now, 1854. 1854, A and B state clearly that the Secretary shall review draft fishery management plans and amendments and regulations to ensure that they're consistent with the national standards and all the required provisions of the act as well as other... But Congress said shall when they meant to be mandatory. But they didn't put a shall provision in for the circumstance that you faced here. I mean, you said yourself at the beginning, in cases like this, it's C that gets it, and that's a May section. It's a May section, but again, it's a grant of authority. It's not a grant of discretion. It's the other parts of the act... I don't understand how you can say it's a grant of authority without recognizing that it grants some specific kind of authority. And the kind of authority it grants can be mandatory or it can be discretionary. But it has to be something. It doesn't grant... That's right. If you have all the authority in the world, it grants something specific. Right. I'm agreeing with you that it grants authority that can be mandatory and it can be discretionary. It is mandatory in the situations where these core requirements of the act that Congress carefully drafted to fulfill the act's purposes are not met by the council. The structure of this section demonstrates that. 1854 A and B deal with those situations when an amendment is submitted, a draft amendment is submitted to the secretary for review. The secretary reviews it to make sure that it complies with the act. If it doesn't comply with the act or other law, it sends it back to the council to take another shot at making it comply. But if the council doesn't act in the first instance or the council doesn't act in the second instance when it's sent back by the secretary, that's when we get to 1854 C. And if that first action dealt with a discretionary provision under 1853 B, then there's no obligation on the secretary to act because Congress didn't say that fishery management plans have to require those types of measures. But if it's a required provision, like a requirement to add a stock to a fishery management plan that's in need of conservation management or a requirement to end overfishing, then the secretary is obligated to act under C. Congress carefully crafted it to use the word may because it's a grant of authority. It's not a grant of discretion to the fishery service to ignore all the requirements of the act. Now, other courts that have looked at similar situations have agreed that it's the fishery service that's ultimately responsible for ensuring that the act's provisions are met. The courts in the Flaherty case, the Gindin case, and the related ACN case all recognized and stated that it's the fishery service that's ultimately responsible for making sure that the provisions of the act are carried out. Do you have a case that says this duty under C is mandatory? No, Your Honor. I don't think so. No, this is the first time, I believe, that we've ever been in a situation where there's a requirement of the fishery service. The council has taken up the rulemaking process and then it stopped the rulemaking process. So we're in a situation where we have a requirement under the act that there's no dispute that these fish, these river heritage shed, require conservation and management. There's no dispute that 1852H requires that fish that need conservation and management be added to the act. The dispute is that the fishery service argues that this is a grant of discretion for them to ignore the mandatory provisions of the act. The act can be read consistently, the way that I'm arguing it, if the may in this section is viewed as a grant of authority. It would be an absurd reading of the act to view this as a strictly discretionary provision because it would allow the fishery service to ignore all of the requirements of the act. And that's clearly not what Congress intended when it wrote this long statute that is designed to put our fishery resources of the country under sound management. Your honors, I'd also like to address the right to review under the Magnuson Act and 706-2 as well. It's our view that the fishery service here did take a discre- It's going to come to standings. I'd be happy to address standings, your honor. Your time is getting short and the first thing we have to do is decide if we have jurisdiction. Your honor, the supplemental briefs that were filed with this court both agree that the fishery service agreed that the English Conservation Network is entitled to standing under review under 5 U.S.C. 706-1. We also believe that we're entitled to review under- What is the harm that the defendant is doing, is causing to your clients that is remedial, remediable in this act? The harm in this situation, your honor, is that by failing to include these severely depleted populations of river herring and shad under a sound fishery management plan, it's hurting our clients who are small businessmen, recreational fishermen, who are unable to go out and harvest the predators that should be present because these fish are being caught in numbers that are too high. If they're put under a sound fishery management plan, which our argument is the fishery service is responsible for ensuring- Is there any actual harm that is remediable without the intervention of third-party actors? Yes, your honor, because it's the fishery service that's ultimately responsible for ensuring that fishery management plans are put in place with all the required provisions in the act, including provisions to end overfishing, protect the habitat that the fisheries- Is this just a springtime phenomenon? It depends upon what part of the coast you're in. The spawning run occurs in the spring simultaneous with the spawning run of striped bass, for example. That's correct. And that's a good example because our fishermen have businesses that take clients out to fish for striped bass and the reason they're able to run their businesses is to go out and catch striped bass. Not in the rivers. Because I think that's prohibited during the spawning run of striped bass. You're not permitted to fish. Those regulations are state by state and I believe that you're right. In some states it is, but these fish are anadromous fish. They spend a great deal of their time in federal waters, more than three miles offshore. So that's the time of year, which is nearly year-round when this case would apply most directly. These fish swim out to sea, they co-mingle with the fish that the mackerel and the squid and butterfish fishermen are trying to catch and these river herring and shad are caught at sea. But there's not federal- There are regulations in effect with respect to the herring and shad for other fisheries, aren't there? There are regulations in place for state waters that are put in place through the Atlantic States Marine Fisheries Commission but that only covers the area from shore out to three miles. So during a small part of the year, when they're in this in these waters, there are regulations in place. But during the other times of the year when they're out at sea, there are virtually no regulations in place and none of the required provisions of the act, such as the requirements to manage populations according to the scientific evidence of how abundant they should be and catch limits and measures to protect essential fish habitat, none of those provisions are in place for the 197 miles in the EEZ that go beyond state waters. It's when these fish are in those large numbers by macro fishermen and thus it has contributed significantly to their depletion over time and the need for them to be managed and conserved under the act. Your Honors, I see that my time is up. Our briefs also explain that we're entitled to review under 7062 and the Magnuson Act because rulemaking started in this situation and rulemaking was stopped by the responsible federal agency, the Fisheries Service. There's a notice of intent published to start rulemaking. There were committees formed and there were meetings held over the course of 16 months to initiate this rulemaking and then the rulemaking stopped. And under the APA, the denial of rulemaking qualifies as a federal action. Thank you. Thank you. Good morning. Robert Lundman representing the National Marine Fisheries Service. I just want to start right away with 1854C. That's the provision that plaintiff's claim creates the mandatory duty here. If you look at the plain language, it just does not. It says the secretary may prepare a fishery management plan and then goes on to list the circumstances in which it can consider doing that. And that language contrasts with the language in 1854A and B. So the provision is immediately before this one. In those, the statutory language says the secretary shall review the counsel's action. So if the counsel approves an amendment, it's transmitted to the secretary, then the secretary has to review that amendment, either approve it, partially approve it, or disapprove it. But the contrast here is with the 1854C. When no such amendment is transmitted and there was no amendment transmitted here, then it's discretionary authority of the secretary to decide whether to act or not. And under the Southern Utah Wilderness Alliance case from the Supreme Court, plaintiffs have to show a clear-cut, mandatory, non-discretionary duty, and that language in C just does not get anywhere near clearing that hurdle. Plaintiffs say step back, look at the entire statutory scheme, that helps them. I don't think it does. The statute here is clear that the counsels are distinct from the secretary and the fishery service. The counsels, in the first instance, are to prepare fishery management plans and amendments. Then, if those are approved, they're transmitted to the secretary. The secretary then performs the review pursuant to 1854A, approves or disapproves. But the scheme is clear that it creates counsels that are distinct and can't just simply be lumped together with the secretary of the fishery service. This isn't a crippling hole in the statute as plaintiffs describe it. Rather, it reflects Congress' choice to give the secretary discretionary authority to jump in and create its own plan when the counsels haven't done so. If plaintiffs are displeased with the secretary's choice, discretionary choice, either to jump in or not to jump in, then they can petition the secretary directly to act under the Administrative Procedure Act. They go to the secretary, the secretary then will decide whether or not to take that discretionary action. But it's just wrong that because it's discretionary, it's a crippling hole. It's an option for the secretary to step in, and that's the only way the language can be read. Has anything happened in the two years since the Mid-Atlantic group said we're going to study this some more? A few things have happened. These are post-State the complaint, but the one thing that happened is Amendment 14 was approved by the counsel and then issued as a rule by the secretary. And that amendment, while it does not do what plaintiffs want, it doesn't add river herring and shad to the fishery management plans of stock, it does provide for protection of those species. So that's number one. And plaintiffs have a case in district court where they've challenged Amendment 14, they've made the same argument that they've made here. The district court has just issued a ruling that they sent in and we sent in a response about in the last two weeks. And it said that they're rejecting their argument under the Magnuson-Stevens Act, finding a problem with our NEPA, with the agency's NEPA work, and a set timeline for remedial briefing. So they've got the same argument they've made here, setting a district court with respect to Amendment 14, and Amendment 14 is one of the changes. In addition, when the counsel voted not to proceed with Amendment 15, it said we're going to take a look at this again in three years. In the meantime, the counsel's working committees have continued to study this. The three-year deadline is a year from now, and the counsel will take up the question again at that point. So this wasn't completely cut off forever, it's rather postponed for further study. The decision on Amendment 14 explains further why that's the case. This is complicated, there's complicating questions of overlap, there's lots of issues of why the River Herring and Chad aren't doing as well as they could. Dams, river access, clean water. Is there any evidence that their population rises or falls over periods of time and that it's cyclical? The evidence is fairly incomplete on this. The fullest discussion of this in our record is in the round JA 147, and that's where the fishery service responded to a petition to list River Herring as threatened or endangered, and summarized all of the data on them as of that point in time. Ultimately decided not to list them as threatened or endangered under the Endangered Species Act, and that decision's in the JA as well, because the data was incomplete. What it shows is there's lots of different stocks of these fish up and down the Atlantic seaboard. Some of them are depleted compared to their historical level, others are less depleted, and the bottom line was the data is just incomplete on this, and that there was no basis at this point for listing under the Endangered Species Act, and that's the same reasoning that applies here with respect to adding the stocks to the fishery plan. The data's incomplete, further study makes sense, that's what the council said it was going to do, and now we're about a year away from the council taking this issue up again. You said that plaintiffs could petition the secretary if they wanted her to exercise her discretion. If they did that, and the secretary declined to act, would they have an action under the APA, or would they have the same problem? Well, they would have an action. The review may be limited, because under 1854C, the secretary has discretion, so I think the review would be did the secretary abuse her discretion in refusing to take the action plaintiffs have asked for. But there would be a record created, they would say, we want you to add the stock secretary under 1854C to the management plan, the secretary would look at that, would consider the submissions from the parties who wanted that, and would have to explain why or why not she is doing that. And that would then be reviewable. But it would be reviewable, a limited review, because it is a discretionary decision, fishery service is the expert in this field, and we would be here arguing that review should be very deferential. But it's a way to get to court, and the district court noted that avenue here, and made clear that they did not so petition. And this court regularly reviews APA 553E decisions on seeking petitions. On the standing questions, it's the government's position that there is not standing with reference to any claim under 1955F2 to be brought under APA section 2? With respect to their claim that there was an action by the secretary, they brought that both under the Magnuson-Stevens Act 1855F2 and under APA 706-2. But you do concede that there is standing, but not a claim for release under the under 706-1. I'm questioning something that you concede in your supplemental brief where you say that federal court must assume arguendo the merits of the his or her legal claim. Now we are to assume factual matters in favor of the alleging party, but you seem to be conceding something that I'm wondering if it's well conceded when you say the legal claim. Is it not the law that we do not assume the accuracy of their statements of law? I think you don't have to assume the accuracy of their statement of law. The cases that, and we cite the Parker case and I think Plaintiff cited the Vietnam Veterans case, they seem to say you assume the validity of their legal claim. I'm not entirely sure what that means to be frank. In this case their legal claim with respect to 706-1 is there is a mandatory duty. If you assume that is right for the purposes of standing analysis. Isn't that an assumption of law rather than fact? It does seem like an assumption of law. Is it not the case that we do not make assumptions of law favorable to the pleading party but only assumptions of fact? I think you make assumptions of fact but then the cases say assume their legal claim is valid and I don't know what that exact, how far that statement reaches. I think what we meant was that we assumed the validity of the claim if the law is there. The legal claim being the claim that is based on those assumptions of fact. If that's the distinction, that it's simply assumptions of fact that are assumed, then I think there would be a question about redressability and traceability or causation as well with respect to 706. I understand that you are, it may not make any difference in result than the threshold question of claim for relief but it is jurisprudentially different to say they've established jurisdiction and don't have a claim as opposed to saying they did not establish jurisdiction. Right. I do think that this Court has also said that as long as you don't reach the merits of their claim, and I here think reaching the merits of their claim would be holding that there is a mandatory duty that the Secretary is not satisfied. I think you could still decide on the threshold question of there is no clear-cut, non-discretionary, unequivocal, using all the SUA language, duty here and that that is still a threshold determination on which you could dismiss their claim as the District Court did here. One more point on their alternative argument in addition to mandatory duty, they say there is an action here by the Secretary, I think I've almost covered this already, but there just isn't an action by the Fishery Service here. The amendment was not stopped by the Fishery Service. It was a vote by the Council not to amend Amendment 15 at this time, and nothing then was transmitted to the Service, and the Service then did not take any action under the Magnuson-Stevens Act. So that means they both don't have standing with respect to that claim because there's nothing that's been caused, nothing traceable to the action by the Fishery Service, and there's nothing that's redressable because there's no action to vacate or set aside, there's no proceeding that the Fishery Service took to remand, and also just means that there's no action that's reviewable under the Magnuson-Stevens Act or under APA 706-2. So unless the Court has any further questions, we ask that you affirm the District Court. Thank you. No? Okay. Mr. Boehme, it appears that you had no time left, but we'll give you two minutes if you need it. Okay, thank you. Your Honor, I apologize for that. Your Honor, the Fishery Service has characterized this as a purely matter of choice for the agency that Congress established, but that's frankly inconsistent with the purposes of the Act, as I said before, to create a comprehensive scheme for managing stocks of fish that require comprehensive or that require conservation management, to bring them under sound management. Do you assume that the Mid-Atlantic Fisheries Council is not a federal agency? That's an open question, but you're right. It appears that they're not a federal agency, and the courts that have looked at this, and we believe the statute, make clear that it's the Fishery Service that's the responsible party here. The Council has no authority. It's unclear to us how the Fishery Service could argue that they could stop rulemaking when they have no authority to do anything. It's the Fishery Service that must ensure. That's correct. That's what they do. They have authority to make recommendations, but it's up to the Fishery Service to ultimately ensure that all the provisions of the Act are met. Their reading would undo the statute, and Your Honor, this would be a serious economic problem for our clients and for us. The Fishery Service could simply choose, because of this word may in this grant of authority, to ignore all the provisions of the Act that are designed to protect fish species so that they can be harvested sustainably in fisheries across the country. I wonder about that. Your Honor, we have to take the at least the factual allegations of your complaint is true, but it's the effect on the striped bass, bluefish, and wheatfish sport fishing that you're claiming is the harm. And yet, it's not in the record, but I seem to recall the reading that the striped bass population and bluefish I'm not sure about the wheatfish, is really at a peak and it's been steadily rising over the years. If you go back to 1965 or something, the population was very low. Your Honor, the Atlantic States Marine Fisheries Commission just recently approved reductions in the ability to harvest striped bass, and that population has increased and decreased over the years. They also eat other forage fish. River herring and shad are a big part of their diet. Mullet and menhaden? That's correct. And sea herring as well, Your Honor. The point here is that if brought under a sound management plan, these fishers can be managed in a more sustainable level and the fact is opposing counsel questioned or opposing counsel commented on how these populations are doing. The river herring and shad populations have been declining for over 50 years and much more precipitously later since these big industrial federal fisheries have ramped up and that has effects on striped bass, wheatfish, bluefish that eat them. Thank you, Your Honor. Thank you, Mr. Fleming. The case will be submitted.
judges: Brown, Sentelle, Randolph